## STATE OF OREGON,
*Appellant,*

*v.*

## THOMAS DANIEL LANGAGER
and Sheila Rene Hendrix,
*Respondents.*

(96-CR-0078-15 and 96-CR-0079-15; CA A95980)

965 P2d 1037

Jonathan H. Fussner, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

David G. Degner, Deputy Public Defender, argued the cause for respondents. With him on the brief was Sally L. Avera, Public Defender.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

ARMSTRONG, J.

## ARMSTRONG, J.

The state appeals from a trial court order suppressing evidence obtained from a search of defendants' pickup. The sole question on appeal is whether the officers had authority to stop defendants based on a reasonable suspicion that they had committed a crime. We review for errors of law, ORS 138.220, and reverse.

The facts are undisputed. On April 2, 1996, a man approached Chelan County Sheriff's Deputy Sanborn on a street in Cashmere, Washington. Sanborn recalled that he had met the man before but could not remember the man's name or where he lived in Cashmere. The man reminded Sanborn that Sanborn had previously helped him in a case involving his son. The man then told Sanborn that a person in Prineville, Oregon, had told him the details of an armed robbery that was to occur later that day in Prineville. The details were that the target was a liquor store that was located near a highway and next to a pizza parlor; that the robbery would occur at about 7:00 p.m. when the store closed; that the robbers were a white couple in their early twenties; that the robbers would be driving a pickup; and that the liquor store did a cash drop at the bank at the close of the day. The man said that he knew the person in Prineville who had given him the information, but he would not divulge his informant's identity or provide any information that would reveal the nature of their relationship.

Sanborn relayed all of that information to Detective Azbill of the Prineville Police Department. Taking the tip seriously, Azbill took steps to prevent the robbery by placing undercover officers inside the liquor store and by setting up a surveillance team outside it. The regular liquor store clerk, Vicky, was replaced by Sergeant Stratton, who had 16 years of experience as a police officer and previous experience as a liquor store clerk. Azbill hid in the back of the store with Vicky. From her vantage point, Vicky was not able to see the customers when they were inside the store, but she was able to hear them and could tell Azbill those whose voices she recognized. The undercover officers were able to communicate with the surveillance team by radio.

At 6:55 p.m., officers saw defendant Hendrix, a white female in her early twenties, walking toward the store. While the other customers who came to the store that evening drove up and parked in front of the store, Hendrix was the only customer who walked to it. After Hendrix entered the store, she asked Stratton where Vicky was. That was a typical question that other customers had asked, and Stratton answered to the effect that she was taking care of some things and that he was just filling in for her. Hendrix then asked for a bottle of Malibu Rum. Stratton briefly stepped out from behind the counter to help look for it, but he was unable to find it. Stratton testified that Hendrix basically looked all around the store and did not appear to look for anything in particular. She appeared nervous and told Stratton that she was going outside to see what her boyfriend wanted.

Hendrix soon returned to the store with defendant Langager, a white male in his early twenties who was wearing a large baggy shirt and a baseball cap. They proceeded to a corner of the store, where they talked quietly, occasionally looking over their shoulders at Stratton and the counter. They then asked Stratton, again, where Vicky was, and Stratton repeated the answer that he had previously given. Stratton testified that they were acting strangely by staring at the cash register and letting other customers go first. After the other customers had made their purchases and left, defendants finally approached the cash register. The way they stood at the counter made Stratton suspicious and uneasy. Instead of standing next to each other, Langager stood directly behind Hendrix, which blocked Stratton's view of Langager's lower body such that Langager could have pulled out a weapon without being seen by Stratton.

Langager asked if he could use the restroom. That request made Stratton even more suspicious, because the restroom was directly behind the counter. Stratton believed that if he let Langager use the restroom, Langager would take out a weapon once he was out of sight and surprise Stratton from behind. Stratton therefore refused Langager's request, which caused Langager to be "pissed off" and "upset." Hendrix then handed a bottle of Mudslide to Stratton to purchase, and Stratton asked for her identification.

She showed him identification and bought the liquor, and defendants then left the store. As they left, defendants said to tell Vicky hello for them. Vicky told Azbill that she did not recognize either of their voices.

Defendants then walked down a dark alley to their pickup, which was parked 150 to 200 yards from the liquor store. Based on the informant's tip and defendants' behavior in the store, Stratton believed that "there [had been] an attempted robbery," and he told Sergeant Hensley to stop defendants. Hensley drove his marked patrol car down the alley and came headlight-to-headlight with defendants' pickup, blocking the pickup as it started to pull forward. Hensley did not turn on his overhead lights but instead shined a spotlight into the pickup's windshield and saw three passengers: Hendrix in the driver's seat, Langager in the middle, and another woman in the passenger seat. Hensley told them to put their hands up, because he "believed that they were armed."[1]

Instead of raising his hands, as his companions did, Langager leaned forward and reached down toward the floor. Hensley was forced to repeat his instruction several times before Langager finally raised his hands. By that time, other officers had arrived, and Hensley told Langager and the woman in the passenger seat to get out of the pickup and walk to the other officers. Hensley did not want Hendrix to get out of the pickup, because it was still in gear and, in order to shift it out of gear, she would have had to place her hands in the area where Langager had earlier been reaching. As Hensley moved to shift the truck into neutral, he saw a shirt lying on the floor in the area where Langager had been reaching. He reached in, lifted the shirt, and discovered a handgun lying underneath it.[2]

Defendants moved to suppress all of the evidence obtained as a result of the stop. The trial court granted the motion on the ground that there was insufficient evidence to

---

[1] We treat Hensley's actions toward defendants as a stop for purposes of this appeal. We do not resolve whether the stop was, in fact, an arrest.

[2] No issue is raised on appeal about whether Hensley acted lawfully in raising the shirt to reveal the gun.

establish that the officers had a reasonable suspicion that defendants had committed a crime. In its analysis, the court emphasized the fact that no robbery had occurred:

> "To the extent [that] the behavior shows any step towards the commission of a crime, it is substantially outweighed by the fact that the couple ultimately purchased a bottle of alcohol and showed the [c]lerk identification."

We disagree with the court's conclusion. Defendants' decision to purchase liquor and leave the store without committing a robbery does not undercut the evidence that had led the officers to suspect that defendants had attempted to commit one. The officers could reasonably conclude that the presence of a clerk other than Vicky and the clerk's refusal to permit Langager to use the restroom had led defendants to abandon a plan to rob the store. Once defendants had made that decision, it would make sense for them to complete a purchase of liquor, because any other action would itself create suspicion about their conduct. We are satisfied that the totality of the circumstances created a reasonable suspicion that defendants had attempted to rob the liquor store or had conspired to do so. Thus, the officers had a lawful basis to stop defendants to investigate whether they had committed a crime. ORS 131.615(1).[3]

Reversed and remanded.

---

[3] There is a factual dispute about whether Hensley drew his weapon and pointed it at defendants during the stop. Because the trial court did not resolve that issue and made no determination about whether the stop constituted an arrest, we do not address the state's claim that the officers had probable cause to arrest defendants when they stopped them.